IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No 19-cv-11880 |
| | ) | |
| DOW SILICONES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## COMPLAINT

The United States of America, by the authority of the Attorney General and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), files this Complaint against Dow Silicones Corporation ("DSC" or "Defendant") and alleges as follows:

## NATURE OF ACTION

Defendant has violated the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, at its Midland, Michigan facility ("the Facility") by, among other things: (1) failing to measure the Facility's emissions of nitrogen oxides ("NOx"); (2) failing to control emissions of hazardous air pollutants; (3) under-reporting the presence of the carcinogen benzene in the Facility's wastewater; (4) failing to test

and repair pieces of equipment leaking air pollutants; (5) failing to control emissions of volatile organic compounds; (6) failing to operate continuous emissions monitoring systems and control equipment within permitted limits; and (7) failing to operate in accordance with the requirements of its CAA operating permit for the Facility.  Defendant has violated the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 - 9675, and the Emergency Planning and Community Right-To-Know Act ("EPCRA"), 42 U.S.C. §§ 11001 - 11050, by failing to report releases of hazardous substances in a timely manner.  Defendant has violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 - 6992, by failing to characterize hazardous waste properly, and by failing to inspect and maintain hazardous waste secondary containment areas adequately.  Defendant has violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 - 1388, by failing to comply with the terms and conditions of its National Pollutant Discharge Elimination System permit ("NPDES Permit"), including by failing to maintain and implement the Storm Water Pollution Prevention Plan ("SWPPP") for the Facility.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28  U.S.C. §§ 1331, 1345, and 1355; Section 113(b) of the CAA, 42 U.S.C. § 7413(b); Sections 109(c) and 113(b) of CERCLA, 42 U.S.C. §§ 9609(c)

and 9613(b); Section 325(b)(3) and (c)(4) of EPCRA, 42 U.S.C. § 11045(b)(3) and
(c)(4); Section 309(b) of the CWA, 33 U.S.C. § 1319(b); and Section 3008(a)(1) of
RCRA, 42 U.S.C. § 6928(a)(1). Venue is proper in this District pursuant to 28
U.S.C. §§ 1391 and 1395; Section 113(b) of the CAA, 42 U.S.C. § 7413(b);
Sections 109(c) and 113(b) of CERCLA, 42 U.S.C. §§ 9609(c) and 9613(b);
Section 325(b)(3) and (c)(4) of EPCRA, 42 U.S.C. § 11045(b)(3) and (c)(4);
Section 3008(a)(1) of RCRA, 42 U.S.C. § 6928(a)(1); and Section 309(b) of the
CWA, 33 U.S.C. § 1319(b).

## NOTICE

2.     The United States has provided notice of the commencement of this
action to the State of Michigan as required by Section 113(b) of the CAA, 42
U.S.C. § 7413(b), and Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

3.     In accordance with Section 113(a) of the CAA, 42 U.S.C. § 7413(a),
EPA notified the Defendant and the State of Michigan of the violations of the
Michigan State Implementation Plan ("SIP") alleged in this Complaint more than
30 days prior to its filing.

## AUTHORITY

4.     The United States Department of Justice has authority to bring this
action on behalf of the Administrator of U.S. EPA pursuant to 28 U.S.C. §§ 516
and 519, Section 305(a) of the CAA, 42 U.S.C. § 7605(a), Section 506 of the

CWA, 33 U.S.C. § 1366, Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), Section 113 of CERCLA, 42 U.S.C. § 9613, and Section 325(b)(3) and (c)(4) of EPCRA, 42 U.S.C. § 11045(b)(3) and (c)(4).

## DEFENDANT

5.      DSC is incorporated and headquartered in the State of Michigan. DSC was formerly named Dow Corning Corporation, and was jointly owned by The Dow Chemical Company ("Dow Chemical") and Corning Incorporated.  Dow Chemical acquired full ownership of Dow Corning Corporation in approximately June of 2016, and subsequently changed its name to Dow Silicones Corporation. DSC is a wholly owned subsidiary of Dow Chemical.

6.      DSC owns and operates a chemical manufacturing plant located at 3901 South Saginaw Road, Midland, Michigan 48686 (hereinafter the "Facility").

7.      DSC is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e); Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); Section 329(7) of EPCRA, 42 U.S.C. § 11049(7); Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5); and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

## STATUTORY, REGULATORY, AND FACTUAL BACKGROUND

## I.     CLEAN AIR ACT

8.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

**New Source Performance Standards**

9.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of U.S. EPA to publish a list of categories of stationary sources, including any categories of sources which are determined to cause or contribute significantly to air pollution that may endanger public health or welfare.

10.     Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires the Administrator of U.S. EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories.  New sources are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such sources.  42 U.S.C. § 7411(a)(2).  These standards are known as new source performance standards ("NSPS").

11.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an applicable NSPS after the effective date of such NSPS.  Thus, a violation of an NSPS is a violation of Section 111(e) of the CAA.

12.     Pursuant to Section 111 of the CAA, 42 U.S.C. § 7411, U.S. EPA promulgated 40 C.F.R. Part 60, Subpart A, §§ 60.1 - 60.19, establishing general requirements applicable to sources subject to any NSPS.  40 C.F.R. § 60.1 states that the provisions of 40 C.F.R. Part 60 apply to the owner or operator of any stationary source that contains an affected facility, the construction or modification of which is commenced after the publication in Part 60 of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility.

13.     40 C.F.R. § 60.2 defines "affected facility" as any apparatus to which a standard is applicable.

14.     U.S. EPA has promulgated NSPS applicable to various industrial categories, including certain industrial-commercial-institutional steam generating units.  40 C.F.R. Part 60, Subpart Db, §§ 60.40b - 60.49b.

15.     The affected facility to which Subpart Db applies is each "steam generating unit" that commences construction, modification, or reconstruction after June 19, 1984, and has a heat input capacity from fuels combusted in the steam

generating unit of greater than 29 megawatts or 100 million British thermal units per hour.  40 C.F.R. § 60.40b.

16.     Under Subpart Db, "steam generating unit" means a device that combusts any fuel or byproduct/waste to produce steam or hot water or any other heat transfer medium.  40 C.F.R. § 60.41b.

17.      40 C.F.R. § 60.48b(b)(1) requires the owner or operator of a Subpart Db affected facility to install, calibrate, maintain, and operate a continuous emission monitoring system ("CEMS") for measuring $NO_X$ and oxygen gas ("$O_2$") emissions discharged to the atmosphere, and record the output of the system.

18.     40 C.F.R. § 60.48b(c) requires the owner or operator of a Subpart Db affected facility to operate, and record data from, the CEMS as required by 40 C.F.R. § 60.48b(b)(1) during all periods of operation at the facility, except for breakdowns and repairs.

## National Emission Standards for Hazardous Air Pollutants

### A.     *General*

19.     Section 112 of the CAA sets forth a national program for the control of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  Under Section 112(b), Congress listed 188 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

20.     Congress directed the Administrator of U.S. EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

21.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

22.     "Stationary source" was and is defined as any building, structure, facility, or installation that emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

23.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31,576, 31,578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id*.

24.     Congress directed the Administrator of U.S. EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs listed.  42 U.S.C. § 7412(d)(1).  These emission

standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emissions reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

25.    To the extent that it is not feasible to prescribe or enforce an emission standard for control of a HAP, Congress authorized U.S. EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards.  42 U.S.C. § 7412(h).

26.    The emission standards promulgated under Section 112 of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology") standards.

27.    After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

B.   **NESHAP for Miscellaneous Organic Chemical Manufacturing (40 C.F.R. Part 63, Subpart FFFF)**

28.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), U.S. EPA promulgated the National Emission Standards for Organic Hazardous Air Pollutants from Miscellaneous Organic Chemical Manufacturing, found at 40 C.F.R. Part 63, Subpart FFFF.  40 C.F.R. §§ 63.2430 - 63.2550.  These provisions commonly are referred to as "Subpart FFFF" or the "Miscellaneous Organic NESHAP" or "MON."  The MON was first proposed as an independent source category in 2002 (67 Fed. Reg. 16,154 (April 4, 2002)), and the regulations were finalized in 2003 (68 Fed. Reg. 63,852 (November 10, 2003)).

29.     The MON establishes emission standards, requirements to demonstrate initial and continuous compliance with emission limits, operating limits, work practice standards, and recordkeeping requirements associated with miscellaneous organic chemical manufacturing.

30.     The "affected source" to which the standards of Subpart FFFF apply is the facility-wide collection of miscellaneous organic chemical process units ("MCPUs") and heat exchange systems, wastewater, and waste management units that are associated with manufacturing materials described in 40 C.F.R. § 63.2435(b)(1), and meets the requirements of 40 C.F.R. § 63.2435(b)(2) and (3). 40 C.F.R. § 63.2440(b).

10

31.     "Miscellaneous organic chemical manufacturing process" means all equipment that collectively functions to produce a product or isolated intermediate product that is specifically described in 40 C.F.R. § 63.2435(b).  40 C.F.R. § 63.2550.

32.     MCPU means the equipment necessary to operate a miscellaneous organic chemical manufacturing process and includes any assigned storage tanks, transfer racks, equipment in open systems that is used to convey or store water having the same concentration and flow characteristics as wastewater, and components such as pumps, compressors, agitators, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connectors, and instrumentation systems that are used to manufacture any material or family of material described in 40 C.F.R. § 63.2435(b)(1).

33.     Subpart FFFF applies to any MCPU that is located at a major source; produces material or a family of materials described in 40 C.F.R. § 63.2435(b)(1)(i) - (v); processes, uses or produces any of the organic HAPs listed in Section 112(b) of the CAA, 42 U.S.C. § 7412(b); and is not an affected source or part of any affected source under another subpart of Part 63 (with certain exceptions not relevant here).  40 C.F.R. § 63.2435(b)(1).

34.     Under Subpart FFFF, affected sources that existed prior to November 10, 2003 were required to be in compliance with Subpart FFFF by no later than May 10, 2008.  40 C.F.R. § 63.2445(b).

C.     *NESHAP for Equipment Leaks (40 C.F.R. Part 61, Subpart V)*

35.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, U.S. EPA promulgated the NESHAP for equipment leaks at 40 C.F.R. Part 61, Subpart V. These regulations establish leak detection and repair ("LDAR") requirements applicable to certain types of equipment at chemical manufacturing facilities.

36.     Under the LDAR regulations, owners or operators of chemical manufacturing facilities must include all components operating in volatile hazardous air pollutant ("VHAP") service in the facility's LDAR program.  "In VHAP service" means that a piece of equipment either contains or contacts a fluid (liquid or gas) that is at least 10% by weight a VHAP as determined according to the provisions of 40 C.F.R. § 61.245(d).

37.     Under the LDAR regulations, owners or operators of chemical manufacturing facilities must identify all components operating in VHAP service, monitor each component to determine if it is leaking, and repair leaks above certain threshold levels.  40 C.F.R. Part 61, Subpart V.

D.   **NESHAP for Pesticide Active Ingredient Production (40 C.F.R. Part 63, Subpart MMM)**

38.   Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), in 1992, EPA identified, *inter alia,* ten categories of agricultural chemicals production as source categories of HAPs.  57 Fed. Reg. 31,576, 31,591 (Table 1) (July 16, 1992). In 1996, EPA transferred an initial source category – butadiene furfural cotrimer production – from the polymers and resins industry group to the agricultural chemicals group.  61 Fed. Reg. 28,197, 28,202 (Table 1) (June 4, 1996).  Then, in 1999, EPA added more source category compounds to the list and grouped the initial and additional source categories into a single source category named "Pesticide Active Ingredient Production."  64 Fed. Reg. 33,550, 33,551 (June 23, 1999).

39.   Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA regulated this source category under what it called the National Emission Standards for Hazardous Air Pollutants for Pesticide Active Ingredient Production, found at 40 C.F.R. Part 63, Subpart MMM.  40 C.F.R. §§ 63.1360 - 63.1369. These provisions commonly are referred to as "Subpart MMM" or the "PAI NESHAP."

40.   The "affected source" to which the emission standards of Subpart MMM apply is the facility-wide collection of pesticide active ingredient manufacturing process units ("PAI process units").  40 C.F.R. § 63.1360(a).  It also

includes waste management units, heat exchange systems, and cooling towers that are associated with the PAI process units.  *Id.*

41.     Pesticide active ingredient or PAI means any material that is an active ingredient within the meaning of Section 2(a) of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136(a), "that is used to produce an insecticide, herbicide, or fungicide end use pesticide product; that consists of one or more organic compounds; and that must be labeled in accordance with" 40 C.F.R. Part 156 for transfer, sale, or distribution.  *Id.* at § 63.1361.

42.     A "PAI process unit" means a process unit that is used to produce a material that is primarily used as a pesticide active ingredient or an integral intermediate and consists of:  the process, associated storage vessels, equipment, connected piping and ducts; and components such as pumps, compressors, agitators, pressure relief devices, sampling connection systems, open ended valves or lines, valves, connectors, and instrumentation systems.  *Id.*

43.      "'Integral intermediate' means an intermediate for which 50 percent or more of the annual production is used in on-site production of any PAI(s) and that is not stored before being used in the production of another integral intermediate or the PAI(s)."  *Id.*

44.     Subpart MMM applies to PAI process units that process, use, or produce a HAP and are located at a plant site that is a major source. *Id.* at § 63.1360(a).

45.     Subpart MMM establishes standards for, *inter alia*, process vents, *id.* at § 63.1362(b); storage vessels, *id.* at § 63.1362(c); wastewater, *id.* at § 63.1362(d); bag dumps and product dryers, *id.* at § 63.1362(e); heat exchange systems, *id.* at § 63.1362(f); and equipment leaks, *id.* at § 63.1363.

46.     "Equipment" is defined as "each pump, compressor, agitator, pressure relief device, sampling connection system, open-ended valve or line, valve, connector, and instrumentation system" in organic HAP service. *Id.* at § 63.1361.

47.     The equipment leak provisions of Subpart MMM found at 40 C.F.R. § 63.1363 refer to and incorporate many of the requirements of 40 C.F.R. Part 63, Subpart H. *See, e.g.*, *id.* at § 63.1363(b).

48.     Under Subpart MMM, affected sources that do not meet certain criteria are deemed to be "existing affected sources." *Id.* at § 63.1360(b). Existing affected sources were required to be in compliance with Subpart MMM by no later than December 23, 2003. *Id.* at § 63.1364(a). New sources were required to be in compliance on June 23, 1999, or upon startup, whichever is later. *Id.* at § 63.1364(b).

E.    *NESHAP for Organic Liquids Distribution (40 C.F.R. Part 63, Subpart EEEE)*

49.    Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), U.S. EPA promulgated the NESHAP for Source Categories for Organic Liquids Distribution (Non-Gasoline) ("OLD").  These standards are codified at 40 C.F.R. §§ 63.2330 - 63.2406.

50.    40 C.F.R. § 63.2334 states that owners and operators of an OLD operation that is located at, or is part of, a major source of HAPs, is subject to the requirements of 40 C.F.R. Part 63, Subpart EEEE, with certain exceptions not relevant here.  40 C.F.R. § 63.2338(a) further states that Subpart EEEE is applicable to new, reconstructed, or existing OLD operations.

51.    40 C.F.R. § 63.2350(a) requires compliance with the emission limitations, operating limits, and work practice standards of Subpart EEEE at all times when subject equipment is in OLD operation.

F.    *Benzene Waste Operations NESHAP (40 C.F.R. Part 61, Subpart FF)*

52.    Pursuant to Section 112 of the Clean Air Act as it existed prior to the CAA Amendments of 1990, 42 U.S.C. § 7412, U.S. EPA listed benzene as a HAP and promulgated standards related to the control of benzene in waste operations. 55 Fed. Reg. 8292 (March 7, 1990).  Thereafter, in 1993, U.S. EPA amended the regulations (58 Fed. Reg. 3072 (January 7, 1993)) and published them at 40 C.F.R.

Part 61, Subpart FF.  40 C.F.R. §§ 61.340 - 61.359.  These regulations commonly

are referred to as the "Benzene Waste Operations NESHAP" or "Subpart FF."

53.     Subpart FF applies, *inter alia*, to chemical manufacturing plants.  40

C.F.R. § 61.340(a).  A "'chemical manufacturing plant' means any facility

engaged in the production of chemicals by chemical, thermal, physical, or

biological processes for use as a product, co-product, by-product, or intermediate

including but not limited to industrial organic chemicals, organic pesticide

products, pharmaceutical preparations, paint and allied products, fertilizers, and

agricultural chemicals."  40 C.F.R. § 61.341.

### G.     *Miscellaneous Coating Manufacturing NESHAP (40 C.F.R. Part 63, Subpart HHHHH)*

54.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), U.S.

EPA promulgated the NESHAP for Miscellaneous Coating Manufacturing at 40

C.F.R. Part 63, Subpart HHHHH.  These standards are codified at 40 C.F.R.

§§ 63.7980 - 63.8105.

55.     The requirements of Subpart HHHHH apply to miscellaneous coating

manufacturing operations that are, *inter alia*, located at or part of a major source of

HAP emissions, as defined in Section 112(a) of the CAA.  40 C.F.R. § 63.7985.

56.     Subpart HHHHH establishes emissions limits, work practice

standards, recordkeeping, and reporting requirements.

**Michigan State Implementation Plan**

57.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each state to

adopt and submit to U.S. EPA a plan that provides for the implementation,

maintenance, and enforcement of primary and secondary National Ambient Air

Quality Standards in the state.  Upon approval by U.S. EPA, the plan becomes the

applicable SIP for the state.

58.     On May 6, 1980, U.S. EPA approved Rule 336.1201 of the Michigan

Administrative Code ("MAC") as part of the federally approved Michigan SIP.  45

Fed. Reg. 29,790 (May 6, 1980).

59.     Michigan Rule 336.1201(3) provides that "[a] permit to install may be

approved subject to any condition, specified in writing, that is reasonably

necessary to assure compliance with all applicable requirements."

60.     On February 23, 2003, U.S. EPA approved the Michigan SIP

requirement at R. 366.1701 and R. 336.1702, New Sources of Volatile Organic

Compound Emissions, as part of the federally approved Michigan SIP (effective

July 3, 2006).  71 Fed. Reg. 31,903.

61.     The Michigan SIP at MAC R. 336.1701 defines "new source" as any

process or process equipment that is either placed into operation on or after July 1,

1979, or for which an application for a permit to install, pursuant to the SIP, is

made to the Michigan Department of Environmental Quality ("MDEQ") on or after

July 1, 1979, or both, except for any process or process equipment, which is defined as an "existing source" under the SIP.  (MDEQ's name was changed recently to the Michigan Department of Environment, Great Lakes, and Energy.)

62.     The Michigan SIP at MAC R. 336.1702(a) and (c) provides that a person who is responsible for any new source of volatile organic compounds ("VOC") shall not cause or allow VOC emissions from a new source in excess of, *inter alia*, the maximum allowable emission rate specified as a condition of a permit to install or a permit to operate.

63.     On May 6, 1980, U.S. EPA approved MAC R. 336.1910 as part of the federally approved Michigan SIP.  45 Fed. Reg. 29,790.  MAC R. 336.1910 applies to air cleaning devices and requires that an air cleaning device shall be installed, maintained, and operated in a satisfactory manner and in accordance with these rules and existing law.

**Title V:  Operating Permit Program**

64.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain air pollution sources, including "major sources."  The purpose of Title V is to ensure that all "applicable requirements" for compliance with the CAA are collected in one permit.

65.     "Major source" under Title V includes, *inter alia*, any stationary source that is a "major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412.

66.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), U.S. EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency.  57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

67.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the implementing regulation at 40 C.F.R. § 70.7(b), make it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

68.     U.S. EPA approved Michigan's Part 70 ("Title V") program, codified at MAC R. 336.1210, on December 4, 2001.  66 Fed. Reg. 62,949 (December 4, 2001); 68 Fed. Reg. 63,735 (November 10, 2003).

69.     40 C.F.R. § 70.6 specifies that the terms and conditions in a permit issued under a Part 70 program, including any provisions designed to limit a source's potential to emit, are enforceable by the Administrator of U.S. EPA under the CAA unless specifically designated by the permitting authority as not being

federally enforceable.  It is a violation of Section 502 of the CAA, 42 U.S.C.

§ 7661a, to operate a source, except in compliance with a Title V permit.

70.    40 C.F.R. § 70.6(c) requires that Title V permits include requirements

for certifying compliance with the terms and conditions contained in the permit,

including emission limitations, standards, and work practices, and identifying

whether compliance was continuous or intermittent.

71.    MDEQ issued Dow Corning (now DSC) a Title V permit numbered

MI-ROP-A4043-2008 for the Facility ("Title V Permit") that became effective on

September 15, 2008.

**DEFENDANT'S DISCLOSURES REGARDING CAA VIOLATIONS**

72.    Based upon information provided by DSC,  DSC has conducted a

compliance review and audit at the Facility ("Audit"), consisting of an evaluation

of approximately 1,400 products or other materials and their associated process

units or distribution operations to determine whether the process units or

distribution operations were subject to 40 C.F.R. Part 63, and, if so, which subpart.

As part of this Audit, DSC retained one or more third party consultants

experienced in MACT applicability determinations.  The consultants prepared and

implemented a multi-step process to identify the presence of HAPs in each of the

approximately 1,400 materials.  Prior to the Audit, DSC:  (i) did not consider the

process units, products, and distribution operations referenced in Paragraph 73

below to be subject to 40 C.F.R. Part 63; (ii) considered them to be subject to a different subpart of 40 C.F.R. Part 63; or (iii) did not consider certain HAPs to be part of the process units or distribution operations and therefore not subject to Part 63.

73.     After completing the Audit and an update, DSC determined the following:

    a.  44 process units are subject to 40 C.F.R. Part 63, Subpart FFFF;

    b.  36 products are subject to 40 C.F.R. Part 63, Subpart HHHHH;

    c.  2 products were subject to 40 C.F.R. Part 63, Subpart MMM;

    d.  26 process units previously identified as subject to 40 C.F.R. Part 63, Subpart FFFF, also contained one or more HAPs not previously evaluated for compliance under the regulations; and

    e.  21 buildings containing distribution operations were subject to 40 C.F.R. Part 63, Subpart EEEE.

74.     Based upon disclosures made by DSC, DSC failed to implement the required subpart of 40 C.F.R. Part 63 for the process units, products, and distribution operations referenced in Paragraph 73, above.

**CAA Enforcement Authority**

75.     Section 113(a)(1) and (3) of the CAA, 42 U.S.C. § 7413(a)(1) and (3), authorizes U.S. EPA to bring a civil action if the Administrator of U.S. EPA finds

that any person is in violation of, *inter alia*, any requirement or prohibition of a SIP

or permit, Title V, or Section 111 or 112 of the CAA, 42 U.S.C. §§ 7411 or 7412.

76.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by the

Federal Civil Penalties Inflation Adjustment Act of 1990, the Federal Debt

Collection Improvement Act of 1996, 31 U.S.C. § 3701, and EPA's Civil Monetary

Penalty Inflation Adjustment Rule, 40 C.F.R. Part 19, provides that any person who

fails to comply with the CAA, its implementing regulations, or the applicable SIP

shall be subject to injunctive relief and civil penalties of up to $32,500 per day for

each violation occurring between March 16, 2004, and January 12, 2009, up to

$37,500 per day for each violation occurring between January 13, 2009, and

November 2, 2015, and up to $99,681 per day for each violation occurring on or

after November 3, 2015.

## II.  COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

### CERCLA Emergency Notification Requirements

77.     Section 102(a) of CERCLA, 42 U.S.C. § 9602(a), requires the

Administrator of U.S. EPA to publish a list of substances designated as hazardous

substances, that may present a substantial danger to public health or welfare or the

environment, and to promulgate regulations establishing that quantity of any

hazardous substance, the release of which shall be required to be reported under

Section 103(a) of CERCLA, 42 U.S.C. § 9603(a) ("Reportable Quantity"). The list of Reportable Quantities of hazardous substances is codified at 40 C.F.R. Part 302.

78.     Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), as implemented by 40 C.F.R. Part 302, requires, in relevant part, that a person in charge of an onshore facility, as soon as he/she has knowledge of a release (other than a federally permitted release) of a hazardous substance from such facility in quantities equal to or greater than the Reportable Quantity notify the National Response Center ("NRC") immediately of such release.

79.     Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 40 C.F.R. § 19.4, provides that any person who violates the notice requirements of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), shall be subject to a civil penalty of up to $37,500 per day for each violation occurring between January 13, 2009, and November 2, 2015, and up to $57,317 per day for each violation occurring on or after November 3, 2015. Additionally, in the case of a second or subsequent violation of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), that person shall be subject to a civil penalty in an amount up to $107,500 per day for each violation occurring between January 13, 2009, and December 6, 2013, up to $117,500 per day for each violation occurring between December 7, 2013, and November 2,

2015, and up to $171,952 per day for each violation occurring after on or after November 3, 2015.

### III.   EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT

**EPCRA Emergency Notification Requirements**

80.    The Emergency Planning and Community Right-to-Know Act ("EPCRA") was enacted on October 17, 1986, as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11001 - 11050).

81.    The purpose of EPCRA is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases.  Emergency Planning and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (November 17, 1986).

82.    To achieve this end, EPCRA mandates that state emergency response commissions ("SERCs") and local emergency planning committees ("LEPCs") be created.  42 U.S.C. § 11001(a) and (c).  EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release.  42 U.S.C. § 11001.  EPCRA further mandates that industrial and commercial facilities, at which a hazardous chemical is produced,

used, or stored, notify SERCs and LEPCs when they have releases of extremely hazardous substances and hazardous substances.  42 U.S.C. § 11004.

83.     Section 304(a)(1) of EPCRA, 42 U.S.C. § 11004(a)(1), requires the owner or operator of a facility to provide notice immediately, as described in Section 304(b) of EPCRA, 42 U.S.C. § 11004(b), if a release of an extremely hazardous substance in quantities equal to or greater than a Reportable Quantity occurs from a facility at which hazardous chemicals are produced, used or stored and such release requires notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

84.     Section 304(a)(3)(A) of EPCRA, 42 U.S.C. § 11004(a)(3)(A), requires the owner or operator of a facility to provide notice immediately, as described in Section 304(b) of EPCRA, 42 U.S.C. § 11004(b), if a release of a hazardous substance in quantities equal to or greater than a Reportable Quantity occurs from a facility at which hazardous chemicals are produced, used or stored and such release requires notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

85.     Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 355.61 define "facility" to mean, in relevant part, all buildings, equipment, structures, and other stationary items which are located on a single site and that are owned or operated by the same person.

**EPCRA Enforcement Authority**

86.     Section 325(c)(1) of EPCRA, 42 U.S.C. § 11045(c)(1), as amended by
the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the
Federal Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 40
C.F.R. § 19.4, provides that any person who violates Section 304 of EPCRA shall
be subject to a civil penalty of up to $37,500 per day for a violation occurring
between January 13, 2009, and November 2, 2015, and up to $57,317 per day for a
violation occurring on or after November 3, 2015.  Additionally, in the case of a
second or subsequent violation of Section 304 of EPCRA, 42 U.S.C. § 11004, that
person shall be subject to a civil penalty in an amount up to $107,500 per day for
each violation occurring between January 13, 2009, and December 6, 2013, up to
$117,500 per day for each violation occurring between December 7, 2013, and
November 2, 2015, and up to $171,952 per day for each violation occurring on or
after November 3, 2015.

## IV.  RESOURCE CONSERVATION AND RECOVERY ACT

87.     RCRA establishes a comprehensive program to be administered by
U.S. EPA for regulating the generation, transportation, and treatment, storage, and
disposal of hazardous waste and used oil.  Section 3008(a) of RCRA, 42 U.S.C.
§ 6928(a), authorizes the United States to commence a civil action in United States

District Court to seek appropriate relief in the event of a violation of RCRA and the regulations promulgated thereunder.

88.     Pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), U.S. EPA granted the State of Michigan authorization to administer a state hazardous waste program in lieu of the federal government's base RCRA program on October 16, 1986.  51 Fed. Reg. 36,804.  The EPA-authorized RCRA permit regulations are codified at MAC R. 299.9101 *et seq.*

89.     Any violations of regulations promulgated pursuant to Subtitle C (Sections 3001 - 3023 of RCRA, 42 U.S.C. §§ 6921 - 6939(e)) or of any state provision authorized pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, constitutes a violation of RCRA subject to the assessment of civil penalties and injunctive relief as provided in Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g).  Therefore, any violations of MAC R. 299.9101 *et seq.* constitute violations of RCRA.

90.     On September 21, 2012, MDEQ issued DSC a hazardous waste management facility operating license ("RCRA Operating License"), pursuant to Part 111, Hazardous Waste Management, of Michigan's Natural Resources and Environmental Protection Act of 1994, as amended, and the hazardous waste administrative rules promulgated thereunder at MAC R. 299.9101 *et seq.*

91.     Part II.A. of DSC's RCRA Operating License, General Operating
Conditions, General Waste Analysis, requires any waste managed at the Facility to
be properly characterized pursuant to MAC R. 299.9302.

92.     MAC R. 299.9302 states that a person who generates a waste as
defined in MAC R. 299.9202 shall determine if that waste is hazardous by, *inter
alia*, determining if the waste is excluded from regulation, listed as a hazardous
waste, or exhibits one or more characteristics of hazardous waste.

93.     In addition to the requirements of its RCRA Operating License, DSC
has operated as a generator, as that term is defined in MAC R. 299.9104(a), and
was subject to certain license-exemption conditions located at MAC R. 299.9306.

94.     MAC R. 299.9306 states that a generator may accumulate hazardous
waste for 90 days or less in a tank without an operating license (if such units are
not subject to an operating license) if the generator complies with Subpart J of 40
C.F.R. Part 265.

95.     Subpart J of 40 C.F.R. Part 265 requires, *inter alia*, that the generator
adequately inspect and maintain the secondary containment systems of its
hazardous waste tanks and spill ponds to detect erosion or signs of releases, and to
remedy any deterioration or malfunction that is found.

**RCRA Enforcement Authority**

96.     Under Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 40 C.F.R. § 19.4, any person who violates RCRA and its implementing regulations shall be subject to injunctive relief and a civil penalty in an amount up to $37,500 per day for each violation occurring between January 13, 2009 and December 6, 2013, up to $71,264 per day for each violation occurring between December 7, 2013 and November 2, 2015, and up to $74,552 per day for each violation occurring on or after November 3, 2015.

## V.   CLEAN WATER ACT

97.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

**National Pollutant Discharge Elimination System**

98.     To accomplish this goal, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source to the waters of the United States except authorized by, and in compliance with, certain enumerated Sections of the CWA, including Section 402 of the CWA, 33 U.S.C. § 1342.

99.     In order to achieve its objective, the CWA includes, *inter alia*, the National Pollutant Discharge Elimination System ("NPDES"), which allows pollutants to be discharged to navigable waters only in accordance with a permit, 33 U.S.C. § 1342.

100.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of EPA or an authorized state may issue a NPDES permit, which authorizes the discharge of pollutants into waters of the United States.

101.    Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to include an "individual, corporation, partnership, [or] association."

102.    Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

103.    Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include, among others, chemical wastes, biological materials, and industrial, municipal, and agricultural waste.

104.    Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" as "any discernible, confined and discrete conveyance, including, but not limited to any pipe, ditch, channel, tunnel, conduit, well [or] discrete fissure . . . from which pollutants are or may be discharged."

105.    Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the permit-issuing authority may issue a NPDES permit that authorizes the discharge of any pollutant into navigable waters of the United States, upon the condition that such discharge meets all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

106.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the State of Michigan requested approval from U.S. EPA to administer its own permit program for discharges into navigable waters within Michigan, and such approval was granted by U.S. EPA on October 17, 1973, 39 Fed. Reg. 26,061 (July 16, 1974).

107.    On November 30, 2009, MDEQ issued Dow Corning a general NPDES permit to discharge stormwater associated with industrial activities. MDEQ issued this NPDES permit, General Industrial Storm Water Permit No. MIS410000, under Certificate of Coverage No. MIS410652 ("2009 NPDES Permit").  The 2009 NPDES Permit was valid from the date of issuance, November 30, 2009, through March 19, 2015.

108.    On March 20, 2015, MDEQ issued Dow Corning a general NPDES permit to discharge stormwater associated with industrial activities.  MDEQ issued this NPDES permit, General Industrial Storm Water Permit No. MIS420000, under Certificate of Coverage No. MIS420040 ("2015 NPDES Permit").  The 2015

32

NPDES Permit is valid from the date of issuance, March 20, 2015, through April 1, 2019.  DSC now holds the 2015 NDPES Permit.

109.   Part I.A.1(a) of the 2009 NPDES Permit and Part I.A.1(c) of the 2015 NPDES Permit require that the permittee implement an acceptable SWPPP, as prescribed by Part I.C of the 2009 and 2015 NPDES Permits.

110.   Part I.C of the 2009 and 2015 NPDES Permits identifies requirements for the permittee's SWPPP contents, implementation, and revision.

111.   Part I.D.3 of the 2009 and 2015 NPDES Permits prohibits the permittee from discharging unauthorized non-stormwater.

112.    Part II.B of the 2009 and 2015 NPDES Permits requires all samples and measurements of the discharge to be representative of the volume and nature of the discharge, and that such samples shall be analyzed using approved test procedures under 40 C.F.R. Part 136.

**CWA Enforcement Authority**

113.   Section 309(b) of the CWA, 33 U.S.C. § 1319(b), provides that U.S. EPA is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, *inter alia*, when any person violates any term or condition of an NPDES permit.

114.   Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the

Federal Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 40

C.F.R. § 19.4, provides that any person who violates any term or condition of a

NPDES permit, is subject to a civil penalty of up to $37,500 per day for each

violation occurring between January 12, 2009 and November 2, 2015, and up to

$54,833 per day for each violation occurring on or after November 3, 2015.

## FIRST CLAIM FOR RELIEF
### (CAA Violations:  Failure to Comply with NSPS Subpart Db at Boilers #12, #13, #14, and the Throx Unit)

115.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18 and

75 - 76 as if fully set forth herein.

116.   At times relevant to this action, the Defendant has been the "owner or

operator," within the meaning of Section 111(a)(5) of the CAA, 42 U.S.C.

§ 7411(a)(5), and 40 C.F.R. § 60.2, of industrial-commercial steam generating

units, within the meaning of 40 C.F.R. § 60.40b - 60.49b, located at the Facility

and designated as Boilers #12, #13, and #14, and the Thermal Oxidizer ("Throx").

Each of these units is an "industrial-commercial steam generating unit" because

each was installed after June 19, 1984, and has a heat input capacity greater than

100 million British thermal units per hour.

117.   Boilers #12, #13, and #14, and the Throx are each an affected facility

subject to the requirements of 40 C.F.R. Part 60, Subpart Db.

34

118.   As the owner or operator of Subpart Db affected facilities, DSC was required to install, calibrate, maintain, and operate a CEMS for measuring $NO_X$ and $O_2$ emissions discharged to the atmosphere, and record the output of the system.  *See* 40 C.F.R. § 60.48b(b)(l).

119.   Defendant has violated 40 C.F.R. § 60.48b(c) on one or more occasions by failing to operate and record data from the CEMS as required by 40 C.F.R. § 60.48b(b)(1) during all periods of operation at the Facility, except for breakdowns and repairs.

120.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(CAA Violations:  Failure to Comply with the MON, 40 C.F.R. Part 63, Subpart FFFF)**

121.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 19 - 34, and 72 - 76 as if fully set forth herein.

122.   The Facility was an "existing source" on November 10, 2003, within the meaning of 40 C.F.R. § 63.2.

123.   From at least November 10, 2003, to the present, the Facility has been a major source of HAPs as defined in Section 112 of the CAA, 42 U.S.C. § 7412, because since at least that time it has been a stationary source located within a

contiguous area under common control that has emitted or had the potential to emit 25 tons per year or more of any combination of HAPs.

124.   The Facility includes certain equipment necessary to operate miscellaneous organic chemical manufacturing processes.  This equipment includes, but is not limited to, valves, pumps, compressors, agitators, pressure relief systems, sampling connection systems, storage tanks, transfer racks, and equipment in open systems used to convey or store water having the same characteristics as wastewater.

125.   The equipment referred to in Paragraph 124 is used to process, use, or produce "materials" within the meaning of 40 C.F.R. § 63.2435(b)(1), including, without limitation, benzene, xylene, and toluene.

126.   The equipment referred to in Paragraph 124 constitutes MCPUs within the meaning of 40 C.F.R. Part 63, Subpart FFFF.

127.   The MCPUs referred to in Paragraph 124 are "affected sources" within the meaning of 40 C.F.R. § 63.2.

128.   The MCPUs referred to in Paragraph 124 process, use, or produce benzene, xylene, and toluene.

129.   Benzene, xylene, and toluene are organic HAPs listed in Section 112(b) of the CAA, 42 U.S.C. § 7412(b).

130.    The MCPUs referred to in Paragraph 124 existed prior to November 10, 2003.  Since May 10, 2008, the MCPUs referred to in Paragraph 124 have been subject to 40 C.F.R. Part 63, Subpart FFFF.

131.    DSC has failed to comply with the following standards of 40 C.F.R. Part 63, Subpart FFFF at the MCPUs referred to in Paragraph 124:

a.    Section 63.2450 General Requirements;

b.    Section 63.2455 Requirements for Continuous Process Vents;

c.    Section 63.2460 Requirements for Batch Process Vents;

d.    Section 63.2470 Requirements for Storage Tanks;

e.    Section 63.2475 Requirements for Transfer Racks;

f.    Section 63.2480 Requirements for Equipment Leaks;

g.    Section 63.2485 Requirements for Wastewater Streams;

h.    Section 63.2490 Requirements for Heat Exchange Systems; and

i.    Sections 63.2520 and 63.2525 Notification and Record Requirements.

132.    Based upon disclosures made by DSC, DSC has failed to comply with one or more requirements of the MON at 44 process units in addition to those referenced in Paragraph 124 above.

133.    The failures by DSC described in Paragraph 131 and Paragraph 132 constitute violations of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulations at 40 C.F.R. Part 63, Subpart FFFF.

134.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

### THIRD CLAIM FOR RELIEF
**(CAA Violations:  Failure to Comply with NESHAP for Equipment Leaks, 40 C.F.R. Part 61, Subpart V)**

135.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 19 - 27, 35 - 37, and 75 - 76 as if fully set forth herein.

136.   At the Facility, DSC owns and operates pumps, compressors, pressure relief devices, sample connection systems, open-ended valves or lines, valves, connectors, surge control vessels, bottoms receivers, and control devices in VHAP service that are subject to the LDAR requirements set forth at 40 C.F.R. Part 61, Subpart V.

137.   At times relevant to this Complaint, DSC has failed to comply with LDAR requirements in 40 C.F.R. Part 61, Subpart V by, *inter alia*, failing to: (i) identify all pieces of equipment subject to LDAR regulation; (ii) properly monitor all pieces of LDAR-regulated equipment as required; (iii) comply with recordkeeping requirements; and/or (iv) perform an analysis demonstrating that designated equipment is not in VHAP service.

138.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## FOURTH CLAIM FOR RELIEF
### (CAA Violations:  Failure to Comply with Benzene Waste Operations NESHAP, 40 C.F.R. Part 61, Subpart FF)

139.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 19 - 27, 52 - 53, and 75 - 76 as if fully set forth herein.

140.   At the Facility, DSC owns and operates a "chemical manufacturing plant" within the meaning of the Benzene Waste Operations NESHAP, 40 C.F.R. Part 61, Subpart FF.  DSC is subject to Subpart FF.

141.   Under Subpart FF, each owner or operator must submit an initial report containing, *inter alia*, the following information:  (i) the Total Annual Benzene ("TAB") quantity from facility waste determined in accordance with 40 C.F.R. § 61.355(a); and (ii) a table identifying each waste stream and whether the waste stream will be controlled for benzene emissions.  40 C.F.R. § 61.357(a)(ii).

142.   Under Subpart FF, the owner or operator must submit reports that update the information set forth in the initial report.  40 C.F.R. § 61.357(b) - (d). Of relevance to this action, facilities with TABs of 1 megagram/year or more must submit these reports annually and are required to include updated information on the facility's TAB.  40 C.F.R. § 61.357(c).

143.   The "TAB" quantity is the "sum of the annual benzene quantity for each waste stream at the facility that has a flow-weighted annual average water content greater than 10 percent or that is mixed with water, or other wastes, at any

time and the mixture has an annual average water content greater than 10 percent." 40 C.F.R. § 61.342(a).

144.   The owner or operator must determine its TAB quantity by multiplying the annual waste quantity of each facility waste stream by the flow-weighted annual average benzene concentration of each such waste stream. 40 C.F.R. § 61.355(a)(1)(iii).

145.   The owner or operator must determine the annual waste quantity at the point of waste generation. 40 C.F.R. § 61.355(b). "Point of waste generation means the location where the waste stream exits the process unit component or storage tank prior to handling or treatment in an operation that is not an integral part of the production process, or in the case of waste management units that generate new wastes after treatment, the location where the waste stream exits the waste management unit component." 40 C.F.R. § 61.341.

146.   In 2008, DSC reported that its annual TAB was between 1 megagram and 10 megagrams.

147.   In its 2008 TAB report and subsequent reports, DSC failed to determine the annual waste quantity for each waste stream at the point of waste generation for all points of waste generation at the Facility, in violation of 40 C.F.R. § 61.355(a)(1)(i) and (b) and Section 112 of the CAA, 42 U.S.C. § 7412.

148.   In its 2008 report and subsequent reports, DSC failed to determine the TAB from Facility waste by calculating the sum of the annual benzene quantity for each waste stream at the Facility, in violation of 40 C.F.R. §§ 61.355(a), (b), (c), 61.342(a), and Section 112 of the CAA, 42 U.S.C. § 7412.

149.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## FIFTH CLAIM FOR RELIEF
### (CAA Violations:  Failure to Comply with Pesticide Active Ingredient Production NESHAP, 40 C.F.R. Part 63, Subpart MMM)

150.    Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 38 - 48, and 72 - 76 as if fully set forth herein.

151.   Based upon disclosures made by DSC, it is the owner or operator of two pesticide active ingredient manufacturing process units ("PAI") at the Facility, and therefore subject to the Pesticide Active Ingredient Production NESHAP at the Facility with respect to each such PAI.

152.   Based upon disclosures made by DSC, DSC failed to comply with one or more requirements of the Pesticide Active Ingredient Production NESHAP with respect to the two PAIs referenced in Paragraph 151.

153.   DSC's failures to comply with the Pesticide Active Ingredient Production NESHAP at each such PAI constitute violations of Section 112 of the CAA, 42 U.S.C. § 7412.

154.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

**SIXTH CLAIM FOR RELIEF**
**(CAA Violations:  Failure to Comply with Organic Liquids Distribution NESHAP, 40 C.F.R. Part 63, Subpart EEEE)**

155.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 49 - 51, and 72 - 76 as if fully set forth herein.

156.   The Facility is a major source of hazardous air pollutants within the meaning of 40 C.F.R. § 63.2.

157.   Based upon disclosures made by DSC, DSC owns or operates an OLD operation within the meaning of 40 C.F.R. § 63.2334 at a major source, and is therefore subject to the Organic Liquids Distribution NESHAP ("OLD MACT"). 40 C.F.R. § 63.2334.

158.   Based upon disclosures made by DSC, it failed to comply with one or more of the requirements of the OLD MACT at 21 buildings with distribution operations to which the OLD MACT applies.  DSC's failures to comply with the OLD MACT at these OLD operations violated Section 112 of the CAA, 42 U.S.C. § 7412.

159.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## SEVENTH CLAIM FOR RELIEF
### (CAA Violations:  Failure to Implement Miscellaneous Coating Manufacturing NESHAP, 40 C.F.R. Part 63, Part HHHHH)

160.    Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 54 - 56, and 72 - 76 as if fully set forth herein.

161.    Based upon disclosures made by DSC, it is subject to the Miscellaneous Coating Manufacturing NESHAP at the Facility, 40 C.F.R. Part 63, Subpart HHHHH.

162.    Based upon disclosures made by DSC, it failed to comply with one or more of the requirements of the Miscellaneous Coating Manufacturing NESHAP for 36 products to which the Miscellaneous Coating Manufacturing NESHAP applied.  DSC's failures to implement the Miscellaneous Coating Manufacturing NESHAP for these products violated the CAA.

163.    The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## EIGHTH CLAIM FOR RELIEF
### (CAA Violations:  Failure to Comply with Michigan SIP)

164.    Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 57 - 63, and 75 - 76 as if fully set forth herein.

165.    MDEQ issued Dow Corning a source-wide Permit to Install ("PTI"), MI-PTI-A4043-2008, for the Facility that became effective on September 15, 2008, pursuant to MAC R. 336.1201.  DSC is now the holder of the PTI.

166.   The PTI limits VOC emissions from all silicone rubber manufacturing processes in emission unit 207-01 to 35.4 pounds per hour ("pph").

167.   On November 9, 2010, DSC caused or allowed the emissions of VOCs in excess of 35.4 pph from emission unit 207-01, in violation of the Michigan SIP at MAC R. 336.1702 and the PTI for the Facility.

168.   The PTI contains temperature limits for the scrubbers and condensers at the following emission units:  303-01, 303-06, 303-07, 303-08, 303-07, 501-49, 502-01, and FG337.  These units referenced above are air emission units within the meaning of MAC R. 335.1910.

169.   On one or more occasions, DSC has operated the scrubbers and condensers in Paragraph 168 outside of the required temperature limits, in violation of the Michigan SIP at MAC R. 336.1702 and 336.1910, the PTI for the Facility, and Section 502(a) of the CAA, 42 U.S.C. § 7661a(a).

170.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## NINTH CLAIM FOR RELIEF
### (CAA:  Violations of Title V Permit Requirements)

171.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18 and 64 - 71 as if fully set forth herein.

172.   The Facility is a "major source" for purposes of Title V of the CAA. 42 U.S.C. § 7661(2)(A).

173.   On one or more occasions, Defendant has violated the Title V Permit by failing to comply with the following:  applicable NSPS requirements (as alleged in the First Claim for Relief); NESHAP requirements (as alleged in the Second, Third, and Fourth Claims for Relief); emission limits or temperature limits set forth in the Facility's PTI for emission units 207-01, 303-01, 303-06, 303-07, 303-08, 501-49, 502-01, 515-01, and 337 (as alleged in the Eighth Claim for Relief).

174.   DSC has also violated Title V by failing to limit emissions of individual HAPs from the Facility to less than 10 tons per year, and to limit emissions of aggregate HAPs from the Facility to less than 25 tons per year.

175.   The failures by DSC referenced in Paragraphs 173 - 174, above, are in violation of Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the implementing regulations at 40 C.F.R. § 70.7(b), that make it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

176.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

## TENTH CLAIM FOR RELIEF
### (CAA:  Violations of Title V Permit Requirements)

177.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 18, 64 - 71, and 174 as if fully set forth herein.

178.   The Facility is a "major source" for purposes of Title V of the CAA. 42 U.S.C. § 7661(2)(A).

179.   Pursuant to 40 C.F.R. § 70.6 (a)(3)(iii), 40 C.F.R. § 70.6 (c)(3)(iii), and DSC's Title V Permit, DSC, as a Title V source, is required to submit compliance certification reports on an annual basis certifying the compliance status of the Facility.

180.   Defendant has violated the Title V Permit by submitting incomplete and inaccurate Title V certification reports on March 13, 2008, March 12, 2009, March 10, 2010, and March 10, 2011, in that the above-referenced reports failed to include violations of the Facility's emission limits for individual and total HAPs.

181.   The failure to certify compliance status accurately in Title V Deviation Reports violates DSC's Title V Permit, Section 502 of the CAA, 42 U.S.C. § 7661a(a), 40 C.F.R. 70.6 (a)(3)(iii)(B), and 40 C.F.R. § 70.6(c)(5)(iii)(C).

182.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 76.

**ELEVENTH CLAIM FOR RELIEF**
**(CERCLA Emergency Notification Violations:**
**Failure to Report Releases of Hazardous Substances, in Violation**
**of Section 103(a) of CERCLA)**

183.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 77 - 79 as if fully set forth herein.

184.   DSC is in charge of the Facility within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

185.   The Facility is an "onshore facility" as defined by Section 101(18) of CERCLA, 42 U.S.C. § 9601(18).

186.   There have been "releases" of "hazardous substances" at the Facility in amounts greater than the applicable Reportable Quantity for the released hazardous substances, as those terms are defined by Section 101(22) and (14) of CERCLA, 42 U.S.C. § 9601(22) and (14).  These releases were not "federally permitted releases" as that term is used in Section 103 of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

187.   DSC failed to notify the NRC immediately of releases from the Facility of hazardous substances in amounts equal to or greater than the Reportable Quantity for those substances on various occasions, including but not limited to the following:

      a.   On August 19, 2010, DSC failed to notify the NRC immediately of a 40 lb. release of benzene;

      b.   On June 12, 2011, DSC failed to notify the NRC immediately of a 24 lb. release of benzene;

    c.  On June 14, 2011, DSC failed to notify the NRC immediately of a 128 lb. release of anhydrous ammonia;

    d.  On July 10, 2011, DSC failed to notify the NRC immediately of a 71 lb. release of benzene; and

    e.  On March 21, 2013, DSC failed to notify the NRC immediately of a 310 lb. release of anhydrous ammonia.

188.   The acts and omissions identified in this claim constitute violations of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and its implementing regulation at 40 C.F.R. § 302.6(a).

189.   The violations alleged in this claim subject Defendant to civil penalties as set forth in Paragraph 79.

## TWELFTH CLAIM FOR RELIEF
**(EPCRA Emergency Notification Violations:**
**Failure to Report Releases of Hazardous Substances**
**or Extremely Hazardous Substances, in Violation of Section 304 of EPCRA)**

190.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 80 - 86 as if fully set forth herein.

191.   DSC is the "owner or operator" of the Facility within the meaning of Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b).

192.   The Facility is a "facility" at which "hazardous chemicals" are produced, used, or stored, as defined by Section 329(3) and (4) of EPCRA, 42 U.S.C. § 11049(3) and (4).

193.    There have been "releases" of "hazardous substances" or "extremely hazardous substances" as defined by Section 329(3) and (8) of EPCRA, 42 U.S.C. § 11049(3) and (8), in amounts greater than the applicable Reportable Quantity for the released substances at the Facility, and such releases required notice under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

194.    DSC failed to immediately notify the SERC and/or the LEPC of releases from the Facility of hazardous substances or extremely hazardous substances in amounts greater than the Reportable Quantity as required by Section 304(a) and (b) of EPCRA, 42 U.S.C. § 11004(a) and (b) on various occasions, including but not limited to the following:

a.   On August 19, 2010, DSC failed to notify the SERC and LEPC immediately of a 40 lb. release of benzene;

b.   On June 12, 2011, DSC failed to notify the SERC and LEPC immediately of a 24 lb. release of benzene;

c.   On June 14, 2011, DSC failed to notify the SERC and LEPC immediately of a 128 lb. release of anhydrous ammonia;

d.   On July 10, 2011, DSC failed to notify the SERC and LEPC immediately of a 71 lb. release of benzene; and

e.   On March 21, 2013, DSC failed to notify the SERC and LEPC immediately of a 310 lb. release of anhydrous ammonia.

195.   The acts or omissions identified in this claim constitute violations of Section 304 of EPCRA, 42 U.S.C. § 11004.

196.   The violations alleged in this claim subject Defendant to civil penalties as set forth in Paragraph 86.

## THIRTEENTH CLAIM FOR RELIEF
### (RCRA Violations:  Failure to Characterize Hazardous Waste Properly)

197.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 87 - 96 as if fully set forth herein.

198.   DSC failed to determine whether numerous wastes discharged to a chemical sewer at the Facility were hazardous wastes, and failed to characterize wastes at the point of generation that were accumulating in less-than-90-day tanks at the Facility, in violation of MAC R. 299.9307 and 299.9302 and Part II.A of DSC's RCRA Operating License, and Section 3006 of RCRA, 42 U.S.C. § 6926.

199.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 96.

## FOURTEENTH CLAIM FOR RELIEF
### (RCRA Violations:  Failure to Inspect and Maintain Secondary Containment Areas Adequately)

200.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 87 - 96 as if fully set forth herein.

201.   DSC failed to inspect and maintain secondary containment systems for spill ponds and hazardous waste storage tanks adequately to detect erosion or

signs of releases, and to remedy any deterioration or malfunction that was found, in violation of MAC R. 299.9306, Part II.E of DSC's RCRA Operating License, and Section 3006 of RCRA, 42 U.S.C. § 6926.

202.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraph 96.

## FIFTEENTH CLAIM FOR RELIEF
### (CWA Violation:  Discharge of Pollutants in Violation of DSC's NPDES Permit)

203.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 97 - 114 as if fully set forth herein.

204.   DSC discharged pollutants from a detention basin to Lingle Drain in violation of its NPDES Permit on various occasions, including but not limited to: June 21 and June 22, 2011, December 23, 2011, August 9 and August 12, 2012, May 26, 2015, and September 3 and September 4, 2015.

205.   Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), each of the violations alleged in this claim subjects Defendant to injunctive relief and to civil penalties as set forth in Paragraphs 113 - 114.

## SIXTEENTH CLAIM FOR RELIEF
### (CWA Violations:  Failure to Develop, Maintain, and Implement the SWPPP for the Facility)

206.   Plaintiff realleges and incorporates by reference Paragraphs 1 - 7 and 97 - 114 as if fully set forth herein.

207.   DSC failed to develop, maintain, and implement an adequate SWPPP for the Facility, in violation of its NPDES Permit and Section 301 of the CWA, 33 U.S.C. § 1311.

208.   The violations alleged in this claim subject Defendant to injunctive relief and to civil penalties as set forth in Paragraphs 113 - 114.

## **PRAYER FOR RELIEF**

Wherefore, based on the allegations set forth above, the United States requests that this Court:

1.   Permanently enjoin DSC from operating the Facility except in accordance with the requirements of 40 C.F.R. Part 63, Subpart FFFF (the MON); 40 C.F.R. Part 61, Subpart V (NESHAP for Equipment Leaks); 40 C.F.R. Part 60, Subpart Db (New Source Performance Standards); 40 C.F.R. Part 61, Subpart FF (Benzene Waste NESHAP); 40 C.F.R. Part 63, Subpart MMM (Pesticide Active Ingredient Production NESHAP); 40 C.F.R. Part 63, Subpart EEEE (OLD MACT); 40 C.F.R., Part 63, Subpart HHHHH (Miscellaneous Coating Manufacturing NESHAP); the Michigan SIP; the PTI and Title V permit for the Facility; MAC R. 299.9307 and 299.9302; and Section 301 of the CWA, 33 U.S.C. § 1311, and DSC's NPDES Permit;

2.   Order DSC to take all steps necessary or appropriate to ensure compliance with the foregoing laws, regulations and permits and to remedy,

mitigate, and offset the harm to public health and the environment caused by the violations of the CAA, CERCLA, EPCRA, CWA, and RCRA alleged herein;

3. Assess a civil penalty against DSC in an amount up to $32,500 per day for each violation of the CAA occurring between March 16, 2004, and January 12, 2009, up to $37,500 per day for each violation of the CAA occurring between January 13, 2009 and November 2, 2015, and up to $99,681 per day for each violation of the CAA occurring on or after November 3, 2015;

4. Assess a civil penalty against DSC in an amount up to $57,317 per day for each violation of CERCLA and EPCRA referred to in Subparagraphs 187.a and 194.a, above, and a civil penalty in an amount up to $171,952 per day for each of the violations of CERCLA and EPCRA referred to in Subparagraphs 187.b, 187.c, 187.d, 188.e, 194.b, 194.c, 194.d, and 194.e, above;

5. Assess a civil penalty against DSC in an amount up to $37,500 per day for each violation of the CWA occurring between January 13, 2009 and November 2, 2015, and up to $54,833 per day for each violation occurring on or after November 3, 2015, with each violation on each day in which a violation occurs constituting a separate violation;

6. Assess a civil penalty against DSC in an amount up to $37,500 per day for each violation of RCRA occurring between January 13, 2009 and

November 2, 2015, and $74,552 per day for each violation occurring on or after

November 3, 2015.

    7.    Award the United States its costs in this action; and

    8.    Grant such other relief as the Court deems just and proper.

                Respectfully submitted,

                FOR THE UNITED STATES OF AMERICA

                JONATHAN D. BRIGHTBILL
                Principal Deputy Assistant Attorney General
                Environment and Natural Resources Division

                CATHERINE BANERJEE ROJKO
                Senior Counsel
                BONNIE COSGROVE
                Trial Attorney
                Environmental Enforcement Section
                Environment and Natural Resources Division
                P.O. Box 7611
                Washington, D.C. 20044-7611
                (202) 514-4315
                (202) 616-6584 (fax)

MATTHEW J. SCHNEIDER
United States Attorney
Eastern District of Michigan

PETER A. CAPLAN
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9784


Of Counsel:

Kasey Barton
Associate Regional Counsel
U.S. Environmental Protection Agency